Good morning. May it please the court, Kent Young, Federal Defenders, on behalf of Mr. Perez, I'd like to reserve one minute for rebuttal. Just keep an eye on the clock and I'll try and help you. Thank you. In Corley v. United States, the Supreme Court held that a delay in presentment for the purpose of interrogation is the epitome of unnecessary delay. And that's exactly what happened here in Mr. Perez's case. Well, I kind of want to ask you about that. Because they start the interrogation within the six-hour safe harbor. And then they take a break. And then it goes how far after that? Another hour or whatever? It went until eight hours after his arrest, two hours after the end of the six-hour safe harbor. So is Corley – it doesn't seem to me that Corley – it certainly is informative. But it doesn't – in Corley, the interrogation started after the six hours, right? That's correct. That's correct, Judge Callahan. And so here we have a long delay. He doesn't get presented until, what, the following Monday? So there's a long delay. And so I'm really wondering, does that delay – is there any nexus to that of what happened before? And I'm just sort of assuming this interrogation maybe wasn't the most complicated. But what if it were a situation where, I don't know, someone decides that they're going to say they've got 17 bodies buried on the – you know, they've killed 17 people and they're in the middle of it. And so now because the six hours are up, we're going to stop the confession where they're saying where all these bodies are buried or someone's kidnapped or any number of things? Well, that hypothetical, for example, where there's an issue about 17 bodies and there's other crimes, that would fall perhaps within the Garcia-Hernandez exception, which deals with delays necessary to determine whether a suspect should be criminally charged. And I think it's pretty clear from this case in looking at both the facts and Agent Hoover's statement at the very outset of the interrogation, which occurred a mere – I believe it was five or ten minutes before the end of the six-hour safe harbor when she told him, no matter what you say today, you're going to jail. It's done. And the fact that Mr. Perez was the driver and sole occupant of a vehicle containing 2.64 kilograms of methamphetamine, it was clear that there was probable cause to charge him. And there was really no doubt at all in the agent's mind that he was going to be criminally charged. So in the situation that you're talking about, Judge Callahan, that would be a situation where if someone's in the middle of confessing to all these new crimes where there's 17 bodies, it would be, in that case, a delay necessary to determine whether a suspect would be criminally charged. So Corley does allow for – when we're looking back and analyzing the six hours on that part of it, so what is your – so is it for the criminal part or do we look to reasonableness or what can we – how do we evaluate that? So Corley really lays out a two-part framework. And the first part is to determine whether the suspect made these incriminating statements within or outside the six-hour safe harbor. And that's consistent with the text of 3501C, which refers to the time the statements were made, not the time the interrogation began. So that's the first part of the analysis. Once that happens, then the second part is to determine whether there was an unnecessary or an unreasonable delay in presentment. So it's clear from this record, and I think the government's even acknowledged in their answering brief, that he made statements outside the six-hour safe harbor. Although one of the wrinkles is that before the district court, at least, the defense counsel said the time – the six hours wasn't a problem. It was under the misimpression, it appears, that the statements were within the six-hour period. Well, two responses to that. First, the district court held at the beginning of the hearing that Mr. Perez made statements outside the six-hour safe harbor. The district court found that the interrogation began within the safe harbor and continued beyond that, which is fair. And then at that point, a few minutes later, the district court took up the question of remedy and asked defense counsel if there was any evidence to be suppressed from December 2nd to December 5th, because the district court had already found there was no unnecessary delay on December 1st, the date of the interrogation. And defense counsel made a fleeting reference to statements within six hours. But then if you look at the exact – the very next sentence, the very next words out of defense counsel's mouth about how – that there was also an unnecessary delay on December 1st and evidence should be suppressed on December 1st because the agents were waiting five hours to start the interrogation. And everybody in that courtroom, I think it's clear from the transcript, knew that this was an interrogation that lasted several hours. So when she's talking about waiting five hours to start the interrogation, it's just – it's a simple matter of arithmetic. Well, it started at, what, 3 or 2 and ended at 530? It started at 345, which was right after he waved his Miranda rights, and then it ended at 6 p.m. So it'd be a two-hour and 15-minute interrogation. Okay. So is the remedy then to suppress the statements that he made after the six-hour clock expired or to suppress the entire confession? It's not really a confession, is it? It's – he made some statements that I guess were used in the government's case in chief to suggest that he was not telling the complete truth about the rental car and so on. That's correct. They were incriminating statements, but it wasn't a confession of guilt. We know from Liera, which concerned – which also did not involve a confession of guilt but concerned incriminating statements, and also the text of 3501C, which refers to incriminating statements, that that does fall within the scope of McNabb-Mallory's definition of a confession. But what's the remedy? That's what I'm struggling with. The remedy would be to suppress statements after the six-hour clock expires, after 4 p.m. But what Ms. Kennedy told the court, the only evidence I'm aware of that came from him were his statements, and those were within the six hours. It's a reading from ER 380. Isn't – I mean, the problem I see here is that the motion that was presented to the court isn't really the motion the court ruled on, and the argument being brought up today concerns statements outside the six hours when the court was being told the statements were within the six hours. Well, I think that if the court looks at Ms. Kennedy's statements in context, it's really a reference to the fact that the court has already ruled at that point that the interrogation shouldn't have stopped at the six-hour mark. And so at that point she's not trying to relitigate the district court's earlier ruling because the district court already said, I reject the argument that he should have been brought in on December 1st because interrogation begins in the safe harbor and continues beyond that, which is fair. So she says, just in passing, yes, there's statements on December 1st. And there were some that did occur within the six-hour safe harbor. Obviously, the first 15 minutes was within the six-hour safe harbor. But then the next part of that, when she's talking about waiting five hours to begin the interrogation, and the district courts and the government and everybody there is agreeing that this is an interrogation that lasted more than two hours, I think when you read those two statements together, I just don't see how it could be fairly interpretive that she's conceding that he didn't make any statements outside the six-hour safe harbor. I'm looking at ER 383, which is page 14 of the hearing transcript, starting at line 13. And the district court does say on the record, Ms. Kennedy concedes no evidence was obtained from the defendant that she's aware of during that period of time. I find that the remedy for any violation would be suppression of evidence that comes as a result. There wasn't any, so it's moot. And she doesn't stand up and say, wait a second, Your Honor, that's not what I said. Well, respectfully, if you look at ER 383, lines 11 through 12, he's referring to the second to the fifth. But the interrogation occurred on the first. So that reference is a reference to the days subsequent to the interrogation, because at that point ‑‑ All right, I see your point. So to the extent that they were basically talking past one another is what you're saying. So if it wasn't even a confession, which you said it wasn't even a confession, and we're only talking about a couple of statements that were made after the six hours, why isn't it harmless? Well, if you look at United States v. Liera, that was a case where the defendant also didn't give a confession of guilt, but he made incriminating statements about Poyos and the cell phone entries that were found on his phone after the six-hour safe harbor. And that was a case where there was pretty compelling evidence of his guilt. It was an alien smuggling case where he was the driver and sole occupant of a vehicle with two undocumented aliens underneath the hood. Underneath the hood. Underneath the hood. And so I think in that case, here we have drugs. We have an inanimate object. So I think in that case, if you have a situation where someone's not getting a confession of guilt and there's people concealed underneath the vehicle, I just respectfully, I think it would have to not be harmless here where he's making incriminating statements about Jesus and there's no Jesus who he could rent vehicles from. It's discovered during the interrogation he owns another vehicle that he's not using. He's telling them that it's broken down and needs a smog check. And I think the best way to see how it's not harmless is to just read the first part of the government's opening brief. Okay, but as I read the record, there are only two key statements that he made after the clocks expired. The statements about the Saturn and there was one other which just escapes my memory now. But otherwise, the statements about Jesus or he couldn't, oh, I'm sorry, I'm ashamed, the telephone call. But everything else would come in, would it not? Well, so he makes the statement about how I'm ashamed. He makes the statement about Jesus and the rental cars. He makes the statement about also his finances, which was also a big part of the gut. That came before. There were parts that came before, but he also talked about. I only saw the two that maybe Mr. Rahy can help me on when he gets up. But I thought there were only two, just the question about the Saturn and the smog and the smog check. And then the I'm ashamed and I won't take the phone call. I see my time has elapsed. If I could just briefly. This is an important issue, so we'll give you a little extra time. It's actually, so we have the renting cars and installments from Jesus, the Saturn, the ashamed. And then I realized in my opening brief I didn't refer back to the statement of facts, which I talked about. I think it's, let me see here. It's page, let me talk about the $200. Let's see here. It's page nine of the opening brief where we're talking about the agents are asking him about his finances. When asked by agents how much money he had in his name, Mr. Perez stated that he only had $200. At trial, the prosecution argued that Mr. Perez's description of his finances doesn't make any sense and that he had an unexplained source of income because he was spending all this money on rental cars. Okay. Thank you. Before you sit down, tell me what's going on now. I understand that Judge Moskowitz has entered his order, which I read. Is the situation improved any, or do we still have a problem down there? Are you referring to Monero Rojas? Yes, and the delays in getting people booked and in front of a magistrate judge. My understanding is the situation has improved, and this obviously occurred around the time of Monero Rojas. So my understanding is that it has gotten definitely better. So you're getting a daily list from whoever, I guess, that tells you how many people we've got out there that have yet to get in front of a judge? That's correct. And then what are you doing? Are you actually sending assistant federal defenders to contact these folks, even though they haven't gotten in front of the judge yet, or how is it working? Well, so the federal defenders are responsible for doing the initial appearances, so they'll handle those for the individuals who are arraigned. And my understanding is there's also been an informal policy of, if it's a U.S. citizen, to make sure that the U.S. citizen isn't booked into the MCC jail facility first, although I'm not entirely sure if that's still going on or not. Okay. All right. Okay. One second. Are you familiar with the Pimentel case? I am not. I'm sorry. Well, I think it's a case where something will come out, but I think all the statements are after the six-hour safe harbor, I believe, in that, and so I didn't know if – Oh, Torres Pimentel. Sorry. Yes, from our office. Yes, I am familiar with that case. Okay. So is that – I mean, is this factually distinguishable so we don't have to wait for that, or do you think we have to wait for it, or – I mean, it would have priority the way we – Well, I listened to the oral argument in that case, and it's – my sense from listening to it is that the panel seems like they're inclined to reverse, and I think it's probably – there's some things that are different about this case. There's also – for one thing, in Torres Pimentel, he actually initiated – my understanding is he actually initiated the conversation with the agents in the van while he was driving or being transported. And here, you have something that falls within sort of the classic definition of what Corley was talking about as being problematic, where you have a delay for the purpose of interrogation. And so I think that in some respects, this is actually a stronger case for reversal and suppression than Torres Pimentel, just because in that case, the – and I know Mr. Ray, I think, also argued that case as well, but I know in that case, I think that because he initiated his conversation with the agents, it seems to be less about what McNabb Mallory was concerned about, whereas here you have agents who are actually interrogating him for – and Mr. Perez for an extended period of time. Okay. Thank you. Thank you very much, Mr. Young. Thank you. All right. Mr. Rahe, what does the government have to say about all this? May it please the Court, Mark Rahe for the United States. The first and foremost point is that this issue is not properly before this Court. Unlike in Torres Pimentel – I wasn't the trial attorney in Torres Pimentel, but I did argue that – that issue was fully litigated there. You had testimony from the agents. You had a timeline. You had all the kinds of things you also had in the Liera case. I understand my opponent. He's a good advocate. He needs to do what he has to do with this record. But ask him when he gets back up to clarify the following. When you look at supplemental excerpts of record, in fact, they never attach any of the motions to dismiss or suppress in their excerpts of record. When you look at SCR 12 through 14, that's the only motion to suppress that was filed below, and it was for the grounds that the statements were involuntary. In SCR 24 through 143, 120 pages of briefing are a motion to dismiss for a rule of five violation. The district – Ms. Kennedy, when you read that transcript from that hearing, never once asked for suppression of any statements. And I know there's been a lot of discussion. The government obviously puts big emphasis on excerpt of record 380. It's as clear a judicial admission as you're ever going to see. Very simple statement. The only evidence that I'm aware of that came from him were his statements, and those were within six hours. There's absolutely no qualification to the statement. I know my opponent says, oh, it's shorthand for what the court had ruled. I don't see that from the face of that statement. And, in fact, the court made a definitive ruling two pages later. Not only that. Well, let's assume that you're right, and I did look at the motion papers that were filed by Ms. Kennedy, and it does appear that it was solely limited to voluntariness. So if that were the complete state of the record, I'd say government wins on waiver. But we also have case law that says if the district court actually reaches the issue and rules on it, then it's not waived. And as I read this hearing transcript that I was just talking with Mr. Young about, the district court does seem to be reaching the issue and making a ruling that there was no Rule 5 violation. Well, there was no Rule 5 violation, but that was the basis of the defense motion. When you even look at the title, motion to dismiss for Rule 5 violation. But Rule 5 is presentment. It's not voluntariness of the confession. Well, it's presentment, yes, but I know my opponent says, oh, there was a merits ruling. It wasn't on the same issue. There was never any testimony or evidence. There were no witnesses, no affidavits on the delay as it pertained to the statement. Well, part of the problem here is we don't even have a declaration from Perez, do we? No, exactly. You know, and I think an important thing to keep in mind. We have Ms. Kennedy's declaration in which she purports to interpret what her client said on the DVD, which the district court looked at. Exactly. But this Court in United States v. Van Coyke, 77 F. 3rd, 288, squarely said, based on a 1970 case called Halbert, that the defense has the burden to prove. When you look at this record, again, no evidence, no witnesses whatsoever. I know my opponent characterizes the district court. The district court's ruling was that, oh, this was for the purpose of interrogation, and that's okay. And then the defense says, well, how? Is that okay? It's not okay. So that's really our problem. The district court makes a ruling which there's a problem with. And I get a ship's passing in the night feeling here. I mean, I certainly understand your argument that the motion initially presented by the defense focused on something else. But the district court spoke a lot broader than that, and in the process, you know, made a mistake and made a mistake that could affect this case, compounded by the fact the defense counsel seemed to say, well, we really don't have a problem with that here, when, in fact, that's the core of the appeal. Having a hard time making sense out of this, why should I say that the issue's been waived given that the district court did make an acknowledged mistake? Well, I'm not, with all due respect to you, I'm not saying that the district court made a mistake. Your question to me is, is delay for the purpose of interrogation improper? How can I argue against that? I think Horley says in his many words. But I don't think that's what Judge Burns found here. In fact, in Excerpt of Record 381, he says, in the absence of any evidence that they deliberately put off interrogating him so that they could stall, taking him in front of a magistrate, that seems a little far-fetched. Well, how's that the issue? Because he's pointing about the lack of evidence. If the defense has the burden and they don't come forward with any evidence that the delay was unreasonable. They stalled. In this case, if the appearance is late, isn't it the prosecution's burden to say, well, it was for a good reason, it was necessarily late. Circumstances required presentment to be late. Well, not as I read the law. If Van Poyth says that the defense has the burden of exclusion, that would seem to me that they're the ones that need to put the evidence forward. Horley doesn't say there's a presumption of unnecessary or unreasonable delay for statements outside of the six-hour safe harbor. It says you then have to examine whether that delay was unreasonable. Here, this Court is faced with the record. And the Court appeared to find the delay unreasonable, certainly as to the following week. I guess we can argue as to whether the delay on Thursday was unreasonable. Exactly. That really is the issue here. And the defense had the burden to show that it was unreasonable that that defendant wasn't brought before arraignment on that day. And the district court said it was okay because interrogation had started and it was okay for them to delay for interrogation. That part we know is the part that's incorrect. Well, I don't know about that. He said it starts within the six-hour safe harbor. What I'm saying is how can a defense, if they have the burden to produce evidence, and in Excerpt of Record 382 the judge says, I don't see any undue delay and there's certainly no evidence presented of it. Well, I guess, does Corley say that because here it started within the six hours, but then it goes over and they took a break because they said that the defendant needed a break and that because it had been going on for a while. So does Corley say that is that, from your perspective, is a delay for interrogation purposes if it started within the six hours and then the delay happened after that? I don't believe so, Your Honor. So what's your best, I mean, you know, Corley is his best case for that proposition, but why does Corley, how, if you analyze what Corley says, how do you justify starting and then carrying over beyond the six hours? How do we analyze that? I think you analyze it by looking at the burden of proof. You need to know what happened in those hours before and that was the defense burden to bring. They need to say, you know, in these cases, there's a full record, Pimentel-Torres, you're the agent. We don't know how many other seizures there were that day. Exactly. You don't know when these agents responded to the scene, whether they were occupied with something else, and that is the defense burden. And there's nothing in the record that tells us what the average number of seizures per day is at the San Ysidro Port of Entry, which I know from other cases is more than one. Absolutely. It can be 10 or 15 a day. And these things take time, as the district court pointed out. And you look at here, I believe when I was reviewing the transcript, the secondary inspector testified, the drugs, it took them a while to find. They had to drive it through the x-ray machine, not once, twice. They had to call a contract mechanic. That, I think, is what you need to know, the full record. This is a worst-case scenario for you, and I believe that what counsel for the defendant said, that the remedy would be to suppress the statements outside the six hours, but that would still leave the ones within the six hours. If that were, if the court, hypothetically, if the court were to go there, why analyze that to me in terms of harmless error? Here, I mean, and I know in my brief I did in terms of plain error, but there's a case, Whitehead, driver, sole occupant, $75,000 retail value of methamphetamine. But wouldn't it be harmless error? Well, yes, and I'm saying all those things would show that it's harmless. And if you look at the balance, not only is the panel pointed out, this was not an actual admission of guilt. These were all circumstantial statements. It would appear that if the vast majority preceded the cutoff point, even as identified by the defense. Do you agree with his recitation of which items of statements would be suppressed? I believe so, Your Honor. The only factual, yes, the only factual distinction I had, I know there's been a lot of talk about this interview starting at 345. I see the Miranda waiver at 240 p.m. Yeah, I thought it started earlier than that, too. I thought 230 or something. But the six-hour clock ran out at roughly 4 p.m., and they didn't finish talking with him until about 530 or something. Correct. Correct, Your Honor. What about the case of the aliens under the hood? I think counsel is arguing that the facts of that case say that it can't be a harmless error. Right. Well, again, you know, Your Honor, you have drugs. How are the facts in your case, in this case, distinguishable from that? Because, obviously, I think people under the hood is a little more favorable to him than drugs somewhere in the car. That's true. I think it's pretty hard to have people under the hood and not know about it, that anyone would believe that. I guess the other big distinction, though, is that here you didn't have the majority of statements coming after the six-hour safe hour. I believe in the era what had happened was they had started an interview of the defendant within, then it turns out there was a technical malfunction with the camera, the video recording, and then they restarted the interview afterwards, so all of those statements came out. So on the relative weight of the evidence, you know, that's how it would distinguish this case. In that case, I don't remember reading anything about this in the opinion, but why wouldn't the agents be able to testify as to what the defendant told them the first time while the battery was dead? Yeah, you know, and I litigated that. That was a few years ago. I honestly can't remember, Your Honor, but I think for purposes of that trial, I mean, maybe that could have been what the strategy should have been to trial, but it wasn't. I believe that the statements they played at trial were all those. That was the end of the case as soon as it got to the night circuit. That were tainted, correct. Okay. Yeah. Do we have any further questions? I'll give you another couple minutes. I'll let Mr. Young run over. I appreciate it. I just want to go back one more time on the judicial admission, because, again, my opponent puts a lot of effort in that comment, and he says, look at that next sentence. I would just make sure this Court knows before I go back to San Diego, you won't see the word, please suppress the evidence. You won't hear defense counsel through that entire hearing ask for suppression. In fact, two pages earlier, at Excerpt of Record 378, it was solely about dismissal as the remedy. And I think it's pretty clear to me if you look at 384, starting at line 6, the Court says, I don't find that dismissal was warranted here for what may be a Rule 5 violation. The suppression is there's nothing to suppress. So that ends that. And I don't hear defense counsel saying, wait a minute, Your Honor, there's something he said after the six-hour window that needs to be suppressed. Agreed, Your Honor. And I guess if the Court has no further questions, the government would see that way. One you may know about, I put something in my notes about the time stamp being off an hour, and I can't remember where it was I made that notation from or what it might be based on. Does that mean anything to you? The time stamp. I saw the same thing. I think the video camera time is off by an hour. Yeah, and that, because all I know is the 240 is when he signs the Miranda waiver, and that's supplemented by the Excerpt of Record 192. Yeah, as far as the time stamp. Maybe Daylight Savings Time had started, and then the agents forgot to reset the DVD. I don't know. But I know it wasn't. It's somewhere in the record. Okay. And one final thing, if that's all right, Judge Callahan, I know you were saying should we wait for Pimentel-Torres. Again, obviously this panel is going to do what it seems right, but I don't think you have to, because not only that, the issue of waiver was not presented there. Well, if we find waiver, I think that's probably right. If we don't find waiver, the only reason we asked you about it was that our staff attorneys alerted us to the fact that Pimentel is pending and that there's a similar issue involved, and what we usually do is talk to the other judges and find out how they're going to handle that issue. So far we don't know what they're going to do. Got it. I guess the other point to make is that all of these things turn on their own unique facts, and, you know, these ones where the record is absolutely barren, a day that it was the defense burden to prove the government would say you can decide it on that basis. All right. But if we got to the fact of, if we got to the analysis of the statements that were made within the six hours and the statements that were made outside the six hours and decided that the two outside had to be, well, I mean I'm just assuming all this hypothetically, had to be suppressed and then do a harmless error analysis, would we have to wait for Pimentel if that's where we were going? It's a second basis not to have to wait for Pimentel. Because? Because you could find harmless error here whereas you couldn't there, or whereas it didn't happen there. And again, based on the... And the interrogation in Pimentel started... And that was, I can't honestly remember. I feel bad. I came here. I mean, I loaded up for this case. I don't remember. Well, I thought the interrogation... I had the same problem. That's okay. I thought the interrogation in Pimentel was after the six hours. But what I heard counsel say that Mr. Pimentel initiated some conversation in the van. Well, that was... I thought the actual interrogation was after six hours. That's what I heard him say too. But we'll ask him again to clarify. Some of it is coming back to me. Pimentel is actually sui generis for this reason. The defendant invoked either counsel or silence. And maybe he was arrested on a Friday and then there was a Martin Luther King Monday. So by definition, and they didn't drive him to the MCC, he re-initiated on a Sunday drive after Friday arrest. By definition, those statements had to come out of the six-hour. Well, I think it's the issue. I'm looking at the issues. There seemed to be that the statements that in question in Pimentel were after the six hours that they're talking about. Right. They were because he was arrested. He was read his rights within the six hours he invoked. And they scrupulously honored that. And then I believe 48 hours later on the way to the downtown jail, you have I believe it's the Oregon v. Elstad issue as to who, you know, whether... Who initiated. Exactly. In the district court in that case, Judge Anello had found that the defendant had re-initiated. And so that, you know, that's... Oregon was a Miranda case, right, because he'd been Mirandized but had not yet been booked into the jail and had not yet had an opportunity to speak with a lawyer. I believe, right. But the question is, all I know is I think he invoked, they honored, and then on the way to the downtown jail the defense said, hey, what's going to happen to me? How much time am I looking at? Then the issue in that case is whether he re-initiated. And you don't have that here. Okay. Same question that I asked Mr. Young. Where are we now? Is the situation improved? Are we still having the same problems? I mean, I have had no information that this is still, you know, a big problem. I know that Judge Moskowitz, in fact, it was referenced in the record here, entered his injunction. I believe that case may be up on appeal. The briefing schedule is in effect, but I'm not sure. But isn't your office preparing the daily list of who is being held but has not yet been arraigned? Or is that somebody else? No, I believe that is the case, Sean. So is the list getting shorter or longer? You don't prepare the list so you don't know. Okay. All right. Thank you very much. Appreciate it. Okay, Mr. Young. Thank you. I'll give you a couple of minutes. Thank you, Judge Howman. A couple of quick points. Mr. Rahey was referring to Van Poyck and the burdens there in that case. Van Poyck is actually a pre-Corley case. I think what it was arguing was you have the burden as the defendant to move to suppress on whatever grounds you're going to suppress on. And in order to tee it up for an evidentiary hearing, at least when I was practicing law in the criminal arena, you would have to file declarations from usually your client, but maybe by counsel, sort of alerting the district court to what the grounds were and whether or not there would be a need for an evidentiary hearing. And that didn't happen in this case. Well, I think with respect to the affidavit, there's really no need in this case with respect to the McNabb-Mowry issue for an affidavit by Mr. Perez. I can understand with voluntariness it might be a more difficult question there. And I think one of the government's critiques below and here with respect to that second issue, the voluntariness issue, was we don't know how close he was to his niece. We don't know if that was coercive, et cetera. All we have was a declaration, as I recall, that Ms. Kennedy filed from her review of the tape. And then she picked out some of the things that the agent said to her client that she thought were coercive. And I think that could very well be problematic with respect to that second issue, the voluntariness issue. That all goes to voluntariness. There's nothing in her declaration that says, and the interrogation continued past the six-hour rule, and I'm moving to suppress on whatever he said after six hours. Well, that's true. There's nothing in her declaration. But the record here, we know just from looking at the DVD that Agent Hover told Mr. Perez, which the district court said he viewed the DVD, and Agent Hover told Mr. Perez at the very outset of the interrogation, no matter what you say today, you're going to jail, it's done. And she also repeated that again during the interrogation. So it's very clear just from Agent Hover's own words that they had made up their mind that he was going to be criminally charged and there was no need to have further interrogation for the purpose of determining. No, I don't know that you can say that from there. I mean, that would be something that they could say that, I mean, if you weren't done talking to someone, the delay wouldn't necessarily, I mean, there could be, you know, like what Judge Tallman said, there could be reasons in terms of if, you know, that there were a whole bunch of people that had got arrested, they'd found dope by a whole bunch of people, so it took that amount of time to get there. So it wasn't, the delay really wasn't for the purpose of holding him to interrogate him. They just couldn't get there. And none of that, we don't have any of that. Well, fortunately in this case, it's actually a little bit cleaner than other cases where, I think, in Torres Pimentel there were multiple drivers or multiple people in the car. Here, Mr. Prez was the driver and sole occupant of a vehicle containing 2.64 kilograms of methamphetamine. And when it comes to probable cause, which is all the Well, I still don't know why they started at 2.30, right? Because they weren't really put on notice of it starting, that that was what the issue was. Because counsel from your office said all the statements occurred within the six hours. Well, just to clarify, I think the interrogation actually started at 3.30. Our interpretation is that the time stamp on the DVD is correct. Are we back to the clock? And that if you wave Miranda at 3.45, and that's what the district court found. The district court is referring to, I think, 3.30 in the exits of record. And I don't think that finding is clearly erroneous. But with respect to Judge Callahan's question about the record, I think, too, my opponent was referring to the trial testimony and a mechanic having to come out. And I think that if you look at, actually, the record here, it's pretty clear that everything was done by really about 11.15. Wouldn't you have to take the drugs were hidden in the steering column console, right? So wouldn't you need a mechanic to come and take that portion of the vehicle apart? That's correct. And we know from excerpts of record 223 that it took 20 to 30 minutes for the contract mechanic to arrive. The vehicle was driven to secondary at approximately 10 a.m. That's in excerpts of record 217, 20 to 30 minutes for the contract mechanic to arrive, excerpts of record 223, and then 15 to 20 minutes for the mechanic to remove the panel where the drugs were concealed. That's in excerpts of record 225. So we're looking at best maybe 11.15, 11.30. Again, because the district court wasn't alerted, and so the government never had the opportunity to bring in testimony as to what else was going on. We don't know whether or not these agents were tied up on another seizure that had commenced at 6 a.m. that morning. And that's not uncommon at this port of entry, based on my experience. Well, I think if the court looks to Valenzuela-Espinoza, there's a discussion in that case about how the delay might have been appropriate because they needed to determine how much there was in the way of drugs to go through and catalog the drugs. And this court rejected that argument. So I think just simply the idea that we need to allow the agents additional time to do further investigation, which the district court is referring to how they need five hours to get up to speed. I think we're talking past one another. I mean, the problem here is that without any notice to the district court that this issue was in need of resolution, there was no opportunity for anybody to find out why the interrogation didn't start until the afternoon when this guy was arrested in the late morning. I respectfully disagree. I think that the problem is that the district court reached the merits of the issue. And so we know, as you were referring to earlier, we know there's case law that says that when the district court reaches the merits, whether it's Scott or Vasquez. What he said was, the passage that I read when Mr. Rahe was up, what he said was if there were a violation, the remedy would be suppression, but there's nothing here to suppress because of what Ms. Kennedy had said, rightly or wrongly. Again, I respectfully disagree. I think that's a reference to December 2nd to December 5th. And I know the government characterizes when the district court is saying this is moot. I think it's pretty clear that he's referring to what happened on December 2nd to December 5th. Excerpts of record. But counsel, we're here before the district court on a motion to suppress. And what we're seeking to suppress are the statements that he made commencing from the very start of the interview on grounds that the statements were not voluntary. There's nothing that's being said to the district court to alert the district court that we're also asking to suppress statements based on an unreasonable delay in violation of Rule 5. Well, so, of course, voluntariness, that's correct, is a separate issue. And I realize that the motion papers, as the government has pointed out, didn't actually, they dealt with an unnecessary delay in presentment and dismissal of the indictment and then suppression of statements due to voluntariness. But then the district court, su sponte, took up the question of remedy. Well, but the argument was being made that because he didn't get before the magistrate judge until Monday, the remedy should be outright dismissal of the entire charge. And the district court was responding to that argument by saying, no, the remedy under Rule 5 for a presentment violation is not dismissal of the indictment. It's suppression of the statements that were made in violation of the six-hour rule. That's correct. He's talking about the remedy. But if you look at excerpts of Record 380, he's referring to, because he's already found there's no unnecessary delay on December 1st. He's already found that because the interrogation began within the safe harbor and continued beyond that, which is fair, there's no unnecessary delay on December 1st. And in excerpts of Record 380, he says, is there any evidence that was gained in the period of Friday afternoon, this would be the second, through Monday when he was finally brought to court. So he's already determined at that point that because there was no unnecessary delay, which you need under McNabb-Mallory to suppress statements on December 1st, that there's no evidence to suppress on December 1st. But then Ms. Kennedy, just a few lines later, she says the only evidence that I'm aware of that came from him were his statements, and those were within six hours. But why wasn't the district court correct when it said there's nothing to suppress here? Well, I think that if I don't buy your voluntariness challenge. He did not. So two responses to that. First, the district court had already found that the interrogation wasn't required to stop at six hours, and I think that, as we've noted, that was an acknowledgment by Ms. Kennedy. She wasn't going to relitigate that. And I think, second, that when you read that full paragraph in context, because it's the very next sentence, however, I think one thing that's also important is they waited five hours to interview him. If they knew that they couldn't get him into the MCC past 530, and yet they're waiting five hours to even start his interrogation, I think that's a Rule 5 violation right there. They should have interviewed him earlier, or they should have interviewed him at the MCC. And this is just even in response to the district court's question of whether there's anything to suppress from December 2nd to December 5th. She's on her own saying, well, actually, no, you should – I know you've already ruled against us on December 1st, but, look, here's one more reason why you should suppress his statements on December 1st. Okay. I think we have the position that it's an intriguing issue, and I thank you both for your excellent argument. We'll take the case under submission and get you an answer as soon as we can. Thank you, Your Honor. Thank you. Thank you.
judges: Tallman, Clifton, Callahan